F I L E D

CLERK OF COURT

2024 AUG -2 AM 9: 20

SUPERIOR COURT
OF GUAM

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| PEOPLE OF GUAM, | CRIMINAL CASE NO. **CF0182-22** |
| vs. | **DECISION AND ORDER** |
| **JASON VINCE LEON GUERRERO,** | |
| Defendant. | |

## INTRODUCTION

This matter came before the Honorable Vernon P. Perez on May 29, 2024 and June 14, 2024, for hearing on Defendant **JASON VINCE LEON GUERRERO's** ("Defendant") Motion to Suppress. Present were Assistant Attorney General Kristine B. Borja on behalf of the People of Guam ("the Government") and Defendant with counsel, Terry E. Timblin. Having reviewed the pleadings, the arguments presented, and the record, the Court now issues the following Decision and Order.

## BACKGROUND

On April 8, 2022, Defendant was indicted with one count of Possession of a Schedule II Controlled Substance with Intent to Deliver (As a First Degree Felony).[1] (Indictment, Apr. 8, 2022). This charge stems from the discovery of suspected methamphetamine and drug

---

[1] The Indictment also charges co-defendant Deeana Marie Babauta with two counts of Possession of a Schedule II Controlled Substance (As a Third Degree Felony). On February 14, 2024, Defendant entered a guilty plea to one count of Possession of a Schedule II Controlled Substance. *See* Plea Agreement, Feb. 27, 2024; Judgment of Conviction, Feb. 27, 2024.

paraphernalia in Defendant's vehicle during the execution of a search warrant of a residence. (Decl. of Richelle Y. Canto, Magistrate's Compl., Mar. 23, 2022).

On March 25, 2024, Defendant filed the instant Motion. On April 8, 2024, the Government filed its Opposition, and on April 16, 2024, Defendant filed his Reply.

On May 29, 2024, the Court heard sworn testimony from Guam International Airport Authority ("GIAA") Police Officers Jan M. Dizon ("Officer Dizon") and Randy Chaco ("Officer Chaco"). On June 3, 2024, Defendant filed a Memorandum re: Scope of Search Warrant in response to testimony provided by Officer Dizon.

On June 14, 2024, the Court heard sworn testimony from Guam Police Department ("GPD") Detective Peter T.F. Paulino ("Detective Paulino") and Defendant. At the conclusion of testimony, the Court gave the parties two weeks to file any proposed findings of fact and conclusions of law, as well as for the Government to file any response to Defendant's Memorandum re: Scope of Search Warrant. The Court did not receive any further briefing from either party.

The Court ascertained the following facts from testimony received on May 29, 2024 and June 14, 2024:

1. The Drug Enforcement Administration ("DEA") was investigating Ivan Leon Guerrero for evidence of drug trafficking.

2. Officer Dizon obtained a federal Search Warrant to search Ivan's residence in Talofofo, Guam and vehicle, a 2017 black Mitsubishi Outlander.

3. On March 22, 2022 around 6:00 in the morning, a joint task force effectuated the federal Search Warrant at 199 Leonardo Tenorio Street, Talofofo, Guam.

4. The subject residence was located on the corner lot of the street near the Seventh Day Adventist Church.

5. Ivan is Defendant's father.

6. The joint operation included DEA, GIAA, GPD, Guam Customs, and Navy Criminal Investigative Division.

7. The GIAA tactical team was responsible for breaching the residence. The tactical team wore bullet proof vests and helmets and carried automatic weapons (AR15).

8. DEA was responsible for perimeter security.

9. GPD Special Investigation Section was responsible with assisting with any other individuals located in the residence who were not the primary targets (Ivan and his wife).

10. Officer Dizon testified that over ten officers from the various agencies were part of the operation.

11. Officer Dizon testified that the plan was to monitor Ivan leaving the residence and conduct a traffic stop further away from the residence.

12. Officer Chaco was part of the tactical team assigned to make entry into the residence.

13. The tactical team used the backside of the residence to enter the house.

14. As the tactical team approached the residence, they noticed a vehicle, a Toyota Corolla, parked directly behind it. Officer Chaco testified that in order for their team to proceed, they had to clear the vehicle for safety purposes. When they went to clear the vehicle, they observed two individuals in the vehicle, a male, later identified as Defendant, and a female, later identified as Co-Defendant Babauta.

15. Officer Chaco instructed Defendant to step out of the vehicle. A few seconds after, Officer Dizon relieved Officer Chaco, and Officer Chaco proceeded to make entry into the residence with the rest of his team. Officer Chaco did not have any further interaction with Defendant. Officer Chaco testified that because Officer Dizon relieved him so quickly, Defendant did not get out of the vehicle before he left; Defendant was still in the vehicle when Officer Dizon arrived. Officer Chaco testified that Defendant was making efforts to get out of the vehicle after being told to do so, but that he had been laying down and laying back.

16. Officer Dizon was part of the perimeter security. Officer Dizon observed one of the tactical team members, Officer Chaco, approach a grey Toyota Corolla at the back of the residence.

17. Officer Dizon saw Officer Chaco talking to someone so he went to take his spot so that Officer Chaco could go to the house and assist with the breach.

18. Officer Dizon observed Defendant and a female sleeping in the front passenger seat.

19. Officer Dizon explained to Defendant why they were there. Officer Dizon asked Defendant to place his hands on the steering wheel. When Defendant placed his hands there, Officer Dizon noticed a box on the dashboard. Officer Dizon asked Defendant what was inside the box, to which Defendant responded he had brass knuckles. Officer Dizon testified that he asked Defendant if he could place the box on the roof of the vehicle for both his and Defendant's safety.

20. Officer Dizon testified that he still needed to present the Search Warrant to the owner of the residence, so GPD came over to assist in taking over the investigation into Defendant (to ask additional questions as to why he was on the premises).

21. Officer Dizon told GPD that there were brass knuckles in the box and that he had to go and serve the search warrant on the residence's owner.

22. Officer Dizon did not have any further contact with Defendant, but did take photos of the vehicle later on.

23. Officer Dizon testified that two individuals were located inside the residence – Rosetta Camacho, the owner, and her son Randy. Both Rosetta and Randy were detained until they cleared and secured the residence.

24. Officer Dizon testified that as part of executing a search warrant, when they encounter people other than the target, they take them into custody, do a pat down, ask for identification, and keep them around until they secure the area, regardless of whether or not they are involved in the investigation.

25. Officer Dizon testified that if Defendant had told him he was going to get out of the car and walk away, he would have told Defendant not to leave.

26. Officer Dizon had never heard of Defendant prior to encountering him on the property.

27. Officer Dizon testified that two flash bang grenades were detonated prior to him encountering Defendant. Officer Dizon believed that the flash bang grenades were used by the tactical team to distract anyone inside the house.

28. Officer Dizon was not dressed like the tactical team and was wearing a long sleeve shirt and a vest.

29. Detective Paulino testified that GPD Special Investigation Section ("SIS") was tasked with security for perimeter of the residence in case there were individuals in the yard or on the property.

30. Detective Paulino indicated that their role included doing a background check on any individuals discovered.

31. Detective Paulino and former Detective Ricky Camacho ("Detective Camacho") were tasked with assisting with two occupants found in a vehicle on the property.

32. Detective Paulino interacted with the passenger, Deeana, and Detective Camacho interacted with the operator, Defendant.

33. Detective Paulino was able to hear the conversation between Detective Camacho and Defendant.

34. Detective Paulino testified that Detective Camacho was inquiring with Defendant what was in the green case found in the vehicle by Task Force Officer Dizon.

35. Detective Paulino testified that Detective Camacho asked Defendant if he could open the case. After the case was opened, Detective Camacho found drug paraphernalia (used pipes). Detective Paulino couldn't remember if brass knuckles were found inside the case.

36. Defendant admitted that the pipes were his.

37. Detective Paulino then asked Deeana to step out of the vehicle. Detective Paulino observed Deeana had a clenched jaw and that she was clenching her right-hand pocket. After Detective Paulino asked her what was in the front pocket, she took out a baggie full of suspected methamphetamines.

38. Deeana said that the drugs belonged to Defendant and Defendant admitted that it was his.

39. Detective Paulino testified that his gun was holstered when he approached the vehicle.

40. Detective Paulino was wearing civilian clothes and a vest over them.

41. Detective Paulino testified that Detective Camacho received verbal consent from Defendant to search the vehicle and that prior to searching the vehicle, Defendant admitted there were several more pipes in the center console.

42. The vehicle was searched and a digital scale, pipes with suspected methamphetamine residue, cut straws and scissors were found. Detective Paulino testified that these items were indicative that these individuals were possibly involved in smoking or distributing methamphetamine.

43. Defendant and Deeana were taken to the SIS Office for further interview.

44. Detective Paulino testified that it was not unusual to encounter other people during the execution of a warrant at a target location because there may be individuals present at the location to purchase.

45. Detective Paulino testified Defendant did not ask to leave when they were at the residence, and that he was willing to speak to them during the interview at the SIS office.

46. When asked if Defendant was advised of his Miranda rights in the field and at the SIS Office, Detective Paulino responded yes and that he waived those rights in writing.

47. Detective Paulino also never heard of Defendant prior to encountering him at the residence.

48. Defendant testified that he and Deeana went to his parent's house to get some hygiene and utensils around midnight. Because the house was locked when they arrived, they fell asleep in the car and waited till morning.

49. Defendant and Deeana live together in Merizo. Defendant testified their kids were being watched by his in-laws while they were in Talofofo.

50. Defendant testified that they didn't go back home because they were trying to conserve gas and that they slept in the car because there was air con.

51. Defendant testified on cross examination that they first slept in the car with the windows cracked down half way and that they turned on the air con twenty minutes before the sun came up so they could cool off.

52. Defendant testified that he woke up when he heard a loud bang. Defendant saw four guys in full uniform with a mask and helmet with their guns drawn on him banging on the car window telling him to wake up.

53. Defendant has gout and takes prescribed medication for it.

54. Defendant testified that he was groggy because of his gout medication.

55. Defendant testified that even though he was groggy and trying to wake up, he could still hear and see everything happening around him clearly.

56. Defendant testified he was having a hard time getting up to unlock the door.

57. Defendant testified that Detective Camacho pulled him out of the vehicle.

58. Defendant testified that Detective Camacho brought him a chair to sit on and that he sat next to the car for thirty minutes before officers took him away from the scene.

59. Defendant testified that he was asked what was in the green box, to which he responded brass knuckles.

60. Defendant testified he was not asked anything else by the officers until he got to Tiyan.

61. Defendant testified that he was not read his *Miranda* rights until he was placed into the patrol vehicle.

62. Defendant testified that he believed he was under arrest because he was handcuffed and placed behind the truck.

63. Defendant denied giving consent to search the box or his vehicle. Defendant testified that no one asked him for consent to search the vehicle.

## DISCUSSION

Defendant argues that his Fourth Amendment rights were violated because he "was not present in either the target residence or vehicle [of the search warrant] and was not under suspicion

of possessing methamphetamine with intent to distribute when he was detained, interrogated and his vehicle searched." (Mot. Suppress at 3, Mar. 25, 2024).[2] The Government opposes, arguing that Defendant voluntarily consented to a search of his vehicle. *See generally,* Opp'n, Apr. 8, 2024.

The Fourth Amendment to the U.S. Constitution "protects against unreasonable searches and seizures and is made applicable to Guam via section 1421(b)(c) of the Organic Act of Guam." *People v. Chargualaf,* 2001 Guam 1 ¶ 14 (internal citations omitted). "Warrantless searches and seizures are per se unreasonable, subject to a few specifically established and well-delineated exceptions." *People v. Camacho,* 2023 Guam 9 ¶ 15. "In the absence of a warrant, the police may lawfully conduct a search or seizure only if an exception to the warrant requirement applies. Voluntary consent is a recognized exception to the warrant requirement." *Chargualaf,* 2001 Guam 1 ¶ 14 (internal citations omitted). "Where the consent occurs during a lawful encounter or detention, the validity of the exception turns on whether the consent was voluntarily given. However, if the consent was given during an unlawful encounter, the consent is invalid and the exception does not apply absent a demonstration by the government both of a sufficient break in the causal chain between the illegality and the seizure of evidence, thus ensuring that the search is not an exploitation of the prior illegality, and of voluntariness." *Camacho,* 2023 Guam 9 ¶ 15.

In this case, the consent occurred during a lawful encounter, as officers were executing a search warrant for the residence where Defendant's vehicle was located. The issue before the Court is whether Defendant's consent was voluntary based on the totality of the circumstances. *See Chargualaf,* 2001 Guam 1 ¶ 25. The Court examines the following factors:

---

[2] On June 3, 2024, Defendant also filed a Memorandum re: Scope of Search Warrant. The Memorandum was filed in response to testimony given by Officer Jan Dizon, whereby Officer Dizon "gave his legal opinion that the Search Warrant alone gave him and the other officers the authority to detain and question LEON GUERRERO," in case the Government subsequently raised the issue or the Court was to consider it sua sponte. *See* Memo. at 2, Jun. 3, 2024. The Government did not assert this as a basis for its opposition to the Motion and never filed a formal written response to the Memorandum, although it was provided the opportunity to do so. *See* Opp'n at 2, Apr. 8, 2024 ("While the Fourth Amendment has a warrant requirement, there are exceptions to the requirement . . . Consent is one exception recognized by both the United States Supreme Court and the Supreme Court of Guam."). The Court declines to further address it as a basis for the search.

1) whether the defendant was detained and the length of time of the questioning; 2) whether the defendant was threatened or intimidated by the police; 3) whether the defendant relied on misrepresentations or promises made by the police; 4) whether the defendant was in custody or under arrest when the consent was given; 5) whether the defendant was in a public or secluded place; and 6) whether the defendant objected to the search.

*Id.* (citation omitted). The Government has the burden to prove by a preponderance of evidence whether Defendant's consent was voluntary. *Id.* "[I]t is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." *Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973). *See also, Camacho*, 2023 Guam 9 ¶ 31 ("When evaluating the totality of the circumstances, a court should balance the factors surrounding consent that it finds relevant; no single factor is dispositive. Relevant factors are guideposts which should not be applied mechanically to the facts of a case. A trial court's totality-of-the-circumstances analysis is not temporally limited to a precise moment. Rather, a trial court receives and weighs evidence according to its judgment and experience and, ultimately, determines what facts are relevant to the analysis.").

Here, it is clear that Defendant was detained. The officers testified that individuals located at the scene would not be allowed to leave until their identifications were confirmed and the scene secured. Officer Dizon testified that if Defendant had told him he was going to get out of the car and walk away, he would have told Defendant not to leave. No testimony, however, was provided as to the length of the detention. Defendant was not formally arrested until after the search of the vehicle. There was no testimony that Defendant relied upon misrepresentations or promises of officers. This interaction took place outside of Defendant's parent's residence early in the morning and not on the side of the street of a main road or other public area. The officers did not testify to holding or aiming their weapons at Defendant or the passenger of the vehicle, Deanna. Defendant testified that he was awoken in the car by four officers with their guns drawn banging on the car window telling him to wake up and that he was pulled out of the vehicle. Defendant also testified that he had taken his prescribed gout medication the night prior which made him groggy. Defendant, however, did not provide any testimony as to whether Detective Camacho

had any weapon aimed at him during their conversations or after he left the vehicle and testified that he just sat outside the vehicle until he was brought to the precinct. The Court therefore finds that these facts do not weigh heavily against a finding of voluntariness. *See, e.g., United States v. Garcia,* 890 F.2d 355, 362 (11th Cir. 1989) (Finding the defendant's consent to search car was voluntary even though fourteen law enforcement agents were present when he was arrested and he was handcuffed at the time he gave consent); *United States v. Espinosa-Orlando,* 704 F.2d 507, 513 (11th Cir. 1983) (Finding the defendant's consent to search voluntary where the defendant was surrounded by four agents, one of whom had his firearm drawn and pointed to the ground.). Lastly, the parties contest whether Defendant actually provided consent. At the Suppression Hearing, Defendant testified that he did not give consent to search the box or the vehicle, and that he was never asked permission by the officers to search his vehicle. Detective Paulino on the other hand testified that Detective Camacho asked Defendant for consent to search both the case that Defendant indicated had brass knuckles inside as well as Defendant's vehicle. Detective Paulino also testified that Defendant never asked to leave the scene nor did he ever ask to end the interview at the SIS Office. Detective Paulino testified that Defendant also waived his *Miranda* rights in writing prior to their interview at the SIS Office.

The Court, having considered the totality of the circumstances above, finds that Defendant voluntarily consented to the officer's search of his vehicle and therefore DENIES Defendant's Motion to Suppress.

**CONCLUSION**

For the foregoing reasons, the Court hereby DENIES Defendant's Motion to Suppress.

**IT IS SO ORDERED** this 2rd day of August, 2024.

HONORABLE VERNON P. PEREZ
Judge, Superior Court of Guam

**SERVICE VIA E-MAIL**
I acknowledge that an electronic copy of the original was e-mailed to:
AG r
T. Temblin
8/2/24  9:29 am
Date       Time
Antonio Cruz
Deputy Clerk, Superior Court of Guam

*People v. Leon Guerrero*
Case No. CF0182-22
Decision and Order